SO ORDERED.

SIGNED this 07 day of August, 2012.

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:

ROBERT R. AMERSON,                              CHAPTER 11
SUE H. AMERSON,                                 CASE NO. 12-03716-8-RDD

　　　　DEBTORS

### ORDER DENYING MOTION

Pending before the Court is the Motion (I) to Determine the Automatic Stay Does Not Apply, or (II) In the Alternative, for Relief from Automatic Stay or for Adequate Protection filed by Branch Banking and Trust Company ("BB&T") on June 8, 2012 (the "Motion"); the response to the Motion filed by Robert and Sue Amerson on June 25, 2012; and the accompanying memoranda of law. The Court conducted a hearing on the Motion and the response on July 12, 2012 in New Bern, North Carolina.

### BACKGROUND

Robert R. Amerson and Sue H. Amerson (the "Debtors") filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on May 16, 2012. In their schedules, filed on June 11, 2012, the Debtors listed BB&T as holding four secured claims. BB&T filed the following claims: 1) $590,113.35, filed on May 31, 2012, secured by 1308

Edgewater Club Road #18, Wilmington, North Carolina; 2) $828.73, filed on June 8, 2012; 3) $157,203.00, filed on June 8, 2012, secured by a first lien on property at 303 Bremerton Drive, Greenville, North Carolina; and 4) $6,407,336.97 filed on July 11, 2012, secured by Capital Stock in Flanders Corporation. In Schedule D, the Debtors listed the claim secured by Capital Stock in Flanders Corporation as being $4,223,661.00. In the Motion, BB&T asserts claims totaling approximately $17,032,834.27 as of the petition date.

The additional claims were comprised of several promissory notes the Debtors executed in favor of BB&T. On July 27, 2010, the Debtors executed a loan agreement that consolidated two previous loans from BB&T to Mr. Amerson and other parties as well as six additional obligations on behalf of entities owned by the Debtors. The July 27, 2010 loan agreement required the Debtors to execute a Securities Account Pledge and Security Agreement on Scott & Stringfellow, Inc brokerage account XXXX-6547 to BB&T to secure payment of the notes under the loan agreement. On December 16, 2010, the Debtors executed an amendment to the loan agreement based on modifications made to the original loan agreement. The amendment to the loan agreement required the Debtors to execute a Pledge and Security Agreement for Publicly Traded, Certificated Securities and two Security Agreements (collectively the "Security Agreements") on December 16, 2010. The Security Agreements granted BB&T a security interest in the capital stock of Flanders Corporation (the "Stock") to secure the debts under the loan agreement and amendment to the loan agreement.

On June 8, 2012, the Court entered the Consent Order (I) Authorizing Sale of Personal Property Free and Clear of Liens and (II) Modifying Automatic Stay. In that order, the automatic stay was modified to allow BB&T to enforce its security interests in the Stock, securing several of BB&T's claims pursuant to the terms of a Disbursement and Escrow Agreement (attached as Exhibit

G to the Joint Motion for Entry of Consent Order (I) Authorizing Sale of Personal Property Free and Clear of Liens and (II) Modifying Automatic Stay Pursuant to Fed. R. Bankr. P. 4001(d)) between the Debtors, BB&T, and Howard, Stallings, From & Hutson, the escrow agent and BB&T's attorney.[1] From the proceeds of sale of the Stock, BB&T's claims were reduced by approximately $11,000,000.00. Approximately $6,052,808.12 in proceeds from the sale were held in escrow pending the resolution of a dispute regarding the extent of BB&T's security interest. The remaining funds were disbursed to the Debtors.

The parties dispute whether BB&T has an interest in the remaining $6,052,808.12 from the sale of the Stock held in escrow based on the Security Agreements. In addition to securing ten other promissory notes, BB&T argues the Stock also secured a promissory note executed on behalf of AME Development Group, LLC with a remaining balance of $5,987,516.91 as of May 16, 2012, as well as two letters of credit, one in the name of Trebor Investments, LLC in the amount of $73,000.00 and another in the name of AME Development Group, LLC in the amount of $346,820.00 (collectively referred to as the "Obligations"). BB&T asserts the language in the Security Agreements extends its security interests in the Stock to secure the Obligations.

In the present Motion, BB&T requests that the Court declare that the automatic stay is not in effect as to the $6,052,808.12 held in escrow or, in the alternative, lift the stay as the

---

[1] The Disbursement and Escrow Agreement provided that the Debtors consent to the liquidation of 4,968,103 shares of stock in Flanders Corporation for $4.40 per share for a total sales price of $21,859,653.20. The proceeds from the sale of the stock were deposited in an escrow account held by Howard, Stallings, From & Hutson. The funds were disbursed as follows: 1) approximately $11,022,232.61 plus per diem interest payment to BB&T for its claims; 2) payment of $513,000.00 for partial satisfaction of two additional BB&T claims; 3) $6,052,808.12 to remain in the escrow account pending settlement of a dispute regarding the AME Development Group, LLC Note 1, AME Development Group, LLC Letter of Credit Note 3, and Trebor Fees; and 4) the remaining balance to be paid to the Debtors.

$6,052,808.12 held in escrow to allow BB&T to proceed against the funds as provided for in its security agreements. BB&T asserts that the automatic stay is not in effect as to the $6,052,808.12 held in the escrow account because the Bankruptcy Code exempts a financial institution's right to liquidate a securities contract, where a bankruptcy petition is an event of default, from the automatic stay pursuant to 11 U.S.C §§ 362(b)(6), 555, 741. BB&T states that the loan agreements grant a security interest in the Stock, provide that filing a bankruptcy petition is an event of default under the agreements, and allow BB&T to sell the Stock and apply the proceeds to the outstanding balance of the debt owed by the Debtors.

In the alternative, should the Court find the exemption provided by § 362(b)(6) does not apply, BB&T asks the Court to grant relief from the automatic stay pursuant to § 362(d)(1), (2) based on filing the petition in bad faith and lack of adequate protection.

In their response, the Debtors deny that the Stock serves as collateral for the Obligations. The Debtors contend that there is insufficient consideration to support the validity of the Security Agreements because the only apparent change to the documents from the previously existing security agreement was to add Mrs. Amerson as a party. Furthermore, the Debtors contend that at the time they executed the Security Agreements, they did not believe the Stock would serve as collateral for the Obligations. Finally, the Debtors argue that BB&T is adequately protected by the $6,052,808.12 in proceeds held in escrow.

The Security Agreements explicitly enumerate nine debts the Stock secures and include a provision which states the Stock secures "[a]ny other note or other document now or hereafter evidencing any debt or obligation whatsoever incurred by any Borrower and payable to Secured

4

Party."[2] The Debtors contend that at the time the Security Agreements were executed it was not contemplated that the Stock would serve as security for the Obligations. In support of their argument, the Debtors cite provisions of the loan agreement with BB&T that specifically outline how the proceeds of the sale of the Stock should be applied. The Debtors assert that no debt included in

---

[2]Specifically the Security Agreements dated December 16, 2010 state:

All promisory notes or other debt obligations listed herein are made in favor of Secured Party as payee and are secured by this Security Agreement.
    (1) Promissory Note from Trebor Investments, LLC dated January 04, 2006, including all amendments and modifications thereto, in the original principal amount of $550,000.00;
    (2) Promissory Note from Trebor Investments, LLC date January 18, 2006, including all amendments and modifications thereto, in the original principal amount of $772,500.00;
    (3) Promissory Note from Trebor Investments, LLC dated May 26, 2006, including all amendments and modifications thereto, in the original principal amount of $225,000.00;
    (4) Promissory Note from Trebor Investments, LLC dated November 08, 2006, including all amendments and modifications thereto, in the original principal amount of $256,000.00;
    (5) Promissory Note from Trebor Investments, LLC dated July 20, 2007, including all amendments and modifications thereto, in the original principal amount of $1,600,000.00;
    (6) Promissory Note from Robert R. Amerson date July 27,2010, including all amendments and modifications thereto, in the original principal amount of $5,282,678.00;
    (7) Promissory Note from Wal-Pat V, LLC dated February 15, 2008, including all amendments and modifications thereto, in the original principal amount of $2,425,000.00;
    (8) Guaranty Agreement of Robert R. Amerson dated July 27, 2010, guaranteeing all debts and obligations of Wal-Pat V, LLC and Trebor Investments, LLC to Secured Party;
    (9) Guaranty Agreement of Sue H. Amerson dated July 27, 2010, guaranteeing all debts and obligations of Wal-Pat V, LLC and Trebor Investments, LLC to Secured Party.
    (10) Any other note or other document now or hereafter evidencing any debt or obligation whatsoever incurred by any Borrower and payable to Secured Party.

the Obligations is listed in the provisions for the division of proceeds. As such, the Debtors argue that the Stock was not intended to serve as security for the Obligations at the time the Debtors executed the Security Agreements.

### DISCUSSION

BB&T asks the Court to determine that the automatic stay does not apply to the Stock pursuant to the exception provided in § 362(b)(6). Section 362(b)(6) provides:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay . . .
>
> (6) under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts.

11 U.S.C. § 362(b)(6).

However, for § 362(b)(6) to apply, BB&T must qualify as a financial institution as defined by 11 U.S.C. § 101(22) and there must be a valid securities contract pursuant to 11 U.S.C. § 741(7)(A). Based on the pleadings and the parties representations at the hearing, it appears to the Court that there is a dispute as to whether the Security Agreements fully convey a security interest in the stock to BB&T on account of the Obligations. As such, there must first be a determination as to the validity of the Security Agreements and whether a security interest attaches to the Stock as collateral for the promissory notes and guaranties that make up the Obligations.

BB&T argues that the Security Agreements are binding against the Debtors based on the language of a dragnet clause, which purports to secure all debts to BB&T, past, present, and future, with an interest in the Stock. BB&T asserts that the plain language of the Security Agreements clearly states that the Stock shall be collateral for any obligations "now existing or hereafter arising of Debtors." Further, BB&T argues the parol evidence rule bars admission of any evidence contravening the plain language of the Security Agreements in their interpretation. BB&T cites case law suggesting the parol evidence rule bars testimony of prior or contemporaneous negotiations of conversations inconsistent with a written contract executed by the parties, or which substitutes a new or different agreement for the one evidenced by the writing. *See Craig v. Kessing*, 297 N.C. 32, 253 S.E. 2d 264 (1979).

The Debtors contend that the Security Agreements reference the specific debts the parties intended the Stock to secure and that itemization throughout the documents accurately reflects the pre-agreement negotiations and discussions in connection with the Security Agreements. Essentially, the Debtors assert the dragnet clause is boilerplate language that does not accurately assert both parties understanding of which debts the parties intended the Stock to secure. As such, the Debtors assert the language in the Security Agreements is ambiguous.

In light of the Debtors' challenge to the language in the Security Agreements, it is inappropriate for the Court to presently find the automatic stay is not in effect or grant BB&T's motion for relief from stay. *See Branch Banking & Trust Co. v. Oliver*, No. 5:99-CV58-BO(3), (E.D.N.C. Aug. 13, 1999) (finding no error in the bankruptcy court's inclusion of evidence establishing mutual mistake rendering language in a deed of trust unenforceable). In *Branch Banking & Trust Co. v. Oliver*, the district court upheld the bankruptcy court's admission of parol

evidence concerning the parties intent related to a dragnet clause in multiple deeds of trust. Similar to the present case, the boilerplate dragnet clause involved in *Oliver*, stated "[t]he Debt . . . shall be at all times deemed to include, any and all other notes or Documents now or hereafter evidencing any debt whatsoever incurred" by the borrower and payable to the lender. *Oliver*, No. 5:99-CV58-BO(3), at 2. Presented with testimony tending to show the parties did not intend to cross-collateralize multiple notes at the time that subsequent modifications were made to the notes, the district court held that "[t]he parol evidence rule does not preclude a party from presenting extrinsic evidence that would render a contract unenforceable, such as a showing of fraud or mutual mistake." *Oliver*, No. 5:99-CV58-BO(3), at 4, (citing *MacKay v. MacIntosh*, 270 N.C. 69, 73, 153 S.E. 2d 800, 803 (1967)).

Accordingly, when faced with a similar set of facts, this Court must defer to the intent of the parties at the time that the Security Agreements were executed. The parties dispute whether the Stock secures only the debts enumerated in the Security Agreements or whether, by virtue of the boilerplate dragnet clause, it also secures the Obligations. Therefore, a determination on the enforceability of the Security Agreements must be made before the Court can determine whether the loan documents constitute a securities contract under § 741(7)(A) and the § 362(b)(6) exception applies; or determines to grant relief from the automatic stay. The questions related to the loan agreement and Security Agreements should be properly addressed in the form of an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001.

For all the above stated reasons, the Motion is **DENIED**.

**SO ORDERED.**

**END OF DOCUMENT**